THE MULLAN CONTRACTING COMPANY ET AL.
*v.* INTERNATIONAL BUSINESS MA-
CHINES CORPORATION ET AL.

[No. 247, September Term, 1958.]

*Decided June 10, 1959.*

The cause was argued before HENDERSON, HAMMOND, PRESCOTT and HORNEY, JJ.

*Wilson K. Barnes* and *Alfred J. O'Ferrall, Jr.,* for appellants.

*Theodore C. Waters, Jr.,* and *Harrison L. Winter,* with whom were *Theodore C. Waters* and *Miles & Stockbridge* on the brief, for appellees.

HORNEY, J., delivered the opinion of the Court.

International Business Machines Corporation (I.B.M. or the supplier) and the Board of Education of Baltimore County (Board of Education) for the use of I.B.M., the plaintiffs below, filed a suit in the Superior Court of Baltimore City against Charles A. Russell, a partnership (Russell or sub-contractor), The Mullan Contracting Company (Mullan or general contractor) and National Surety Company and Maryland Casualty Company (National and Maryland or sureties), the defendants below, for the balance due on the electrical time and fire alarm equipment (usually hereinafter referred to as "equipment") supplied by I.B.M. and installed in the Kenwood Senior High School (Kenwood project or project). When I.B.M. moved for summary judgment, the lower court granted the motion against all of the defendants (except James A. Russell who was not a copartner). From the judgment for $2420.50 ($1937.50 plus interest), Mullan and the sureties appealed.

Mullan, who had sub-contracted with Russell to furnish and install all of the electrical facilities in the project, paid the sub-contractor from time to time while the work was in progress

and eventually paid them in full. However, the sub-contractor, who purchased the time and fire alarm equipment from I.B.M., made several payments on account thereof, but failed or refused to pay the balance due of $1937.50.[1]

I.B.M., joining five causes of action in one amended declaration, sued Russell on the simple contract and Mullan, as principal, and National and Maryland, as sureties, on payment and performance bonds. Among other things, it was alleged that the sub-contractor ordered the equipment from I.B.M., promised to pay therefor, received delivery thereof and installed it in the Kenwood project, but failed or refused to fully pay therefor. It was further alleged that the principal as well as the sureties on the bonds, although notified of non-payment, also refused to pay the balance due of $1937.50.

In his deposition, L. Thomas Russell (one of the copartners) testified that the partnership had purchased the equipment from I.B.M. at a total cost of $4367, that the prices charged were fair and reasonable and reflected the then current market prices, and that all of the equipment purchased for the project had been installed therein. He further testified that the "summary invoice" attached to the amended declaration was, to the

---

1. The "summary invoice" filed with the amended declaration is self-explanatory:

### C. A. RUSSELL

| Order No. | Order Date | Shipment Date | Invoice Amount |
|---|---|---|---|
| E.18084** | 10.21.53 | 10.1.54 | $4367.00 |

| Date Paid | Check No. | Invoice Date | Invoice No. | Check Amount |
|---|---|---|---|---|
| 5.31.55 | 9291 | 10.1.54 | E 18084 | $ 419.00*** |
| 6.30.55 | 9422 | 10.1.54 | E 18084 | 1000.00 |
| 8.31.55 | 9570 | 10.1.54 | E 18084 | 500.00 |
| 10.31.55 | 9727 | 10.1.54 | E 18084 | 500.00 |
| 4.30.56 | C/M No. 1514 | 10.1.54 | E 18084 | 10.50 Cr. |

Total Paid ................................... $2429.50
Total Due .................................... $1937.50

**C. A. Russell Order No. 2990; Job No. 953 (Kenwood High School).

***Actual check amount of $500.00—$81.00 was used to clear invoice No. E 23094.

best of his knowledge, correct, and, although he was not absolutely sure that the "payment schedule," showing total credits of $2429.50, was correct, he thought it was because he recognized the check numbers. He was also of the opinion that at that time [May 31-October 31, 1955] his firm did not have any other accounts with I.B.M. He also recalled that I.B.M. had made a mistake by crediting $500 on May 31, 1955, when the credit should have been only $419, and that the last statement received showed a balance due of $1948, which, when credited with $10.50 for a returned outlet box, would reduce the unpaid balance to $1937.50. On cross-examination, the deponent reiterated that while his firm had purchased other materials from I.B.M. for other projects from time to time, the firm, as of May 31, 1955, was not indebted to I.B.M. for anything other than equipment purchased for use in the Kenwood project.

In connection with a request for admission of facts and genuineness of documents pursuant to Rule 421, other pertinent facts were established by attaching a true and correct copy of the contract between Mullan and the Board of Education. The basic contract incorporated by reference true and correct extracts of several documents contained in two bound volumes. These, together with forms of the payment and performance bonds, were also attached to the request for admission. The truth and correctness of an omitted rider to one of the bonds was subsequently supplied by stipulation. The request for admission further established that the general contractor and the sureties had been notified of the failure and refusal of the subcontractor to pay I.B.M.

After the amended declaration had been filed on February 4, 1957, many other pleadings were filed during the ensuing period of nineteen months. But when I.B.M., on September 24, 1958, moved for summary judgment as a matter of law pursuant to Rule 610, the case moved more rapidly to a conclusion. Claiming there was no genuine dispute as to any material facts, the motion was based on the pertinent pleadings, the admissions and the only deposition then on file. Two days later, Mullan and the sureties filed what they termed was an

"answer"—for which the rule does not provide [2]—stating that there was a genuine dispute between the parties as to "many" material facts and that the "defendants" — but meaning the plaintiffs—were not entitled to judgment as a matter of law, but such facts as were claimed to be in dispute were not specified.

On October 20, 1958, an affidavit made by Charles H. Feihe (secretary-treasurer of Mullan) was filed in opposition to the motion. Therein the affiant made oath that he had personal knowledge that I.B.M. generally charged all purchases made by the sub-contractor to a running account without designating in which of several projects a particular purchase was to be used, that other projects were in progress subsequent to October 1, 1954, and that the sub-contractor had paid I.B.M. $8360 between October 1, 1954, when the Kenwood materials were shipped, and October 31, 1955, when the last payment was made on account of them, although during that time I.B.M. had charged the sub-contractor with purchases aggregating only $4367. At the summary judgment hearing on October 23, 1958, I.B.M. called the affiant, who was allowed to testify without objection.[3] He admitted that he had never been employed by I.B.M. nor the sub-contractor, and that the only knowledge he had had been gathered from an analysis of a ledger card furnished him by the attorneys and other evidence in the case. His testimony on the point was stricken as speculative.[4]

On October 22, 1958—one day before the summary judgment hearing had been set and more than twenty months after

2. Rule 610 a 3 provides that *opposing affidavits* may be filed to a motion for summary judgment.

3. Rule 610 b provides that the court may permit affidavits to be opposed by *depositions* or by *further affidavits*.

4. Apparently the general contractor and sureties never sought an opportunity to avail themselves of the applicable provisions of Rule 610 d 2 when they learned that their opposing affidavit was useless to present the facts they now claim were essential to justify their opposition to summary judgment. The rule provides that a court "may order a continuance [or postponement] to permit affidavits to be obtained or depositions to be taken or discovery to be had or make such other order as justice may require."

the amended declaration had been filed—Mullan and the sureties moved for discovery of I.B.M.'s billings to and receipts from the sub-contractor, its accounting card system and all writings between the supplier and the sub-contractor. On the same day notice was served of the desire to take the depositions of two I.B.M. managers on October 30, 1958. At the conclusion of the summary judgment hearing the court made an order postponing the taking of the depositions and staying the production of the records pending further order of the court.

On appeal, Mullan and the sureties raise only one question —that the trial court erred in entering summary judgment— but they assigned a number of reasons to support the contention which appear to fall into four principal categories: (i) those which assert there is a genuine dispute as to material facts; (ii) those which assert the data offered in support of summary judgment was defective and insufficient; (iii) those which assert that I.B.M. was not entitled to judgment as a matter of law; and (iv) that which asserts the allowance of interest on the claim was improper.

(i)

The pleadings, admissions, deposition, opposing affidavit, and the oral testimony of the affiant—taken in open court—show that there was no genuine dispute as to any material fact. There were claims that there was no showing of the installation of any I.B.M. materials in the Kenwood project, and that the balance due by the sub-contractor to the supplier was for such materials. The only evidence on this point came from one of the Russell partners, but it was contrary to these claims. Even though the testimony of the deponent was expressed in general terms, it was ample to demonstrate his familiarity with the transactions between his firm and I.B.M. Moreover it was uncontradicted and shows conclusively that the materials in question were used in that project and that a balance of $1937.-50 was due and owing for them. The deponent was certain of this fact because at the time the first payment of $419 was made on May 31, 1955, on account of the Kenwood materials, his firm had simultaneously paid I.B.M. in full for all materials used in other projects. In any event, the summary invoice

shows that all subsequent payments made were credited against the single charge for the Kenwood materials. But—because the total cost of these materials came to only $4367, while the total payments made to I.B.M., on what was termed its "running account" with the sub-contractor, during a part of the same period the Kenwood project was in progress, totaled $8360—Mullan and the sureties contend that I.B.M. should show why the total payments of $8360 had not fully paid for the item of $4367. As to this they are wrong. Generally, if neither party to a running account makes an appropriation the law appropriates the payment according to the justice of the case and usually to the payment of the earliest debt. *T. Dan Kolker, Inc. v. Shure,* 209 Md. 290, 121 A. 2d 223 (1956); *Carozza v. Brannan,* 186 Md. 123, 46 A. 2d 198 (1946). See however, Restatement, *Contracts,* § 394, Illustration 3. But, be that as it may, there is no basis for the claim that the supplier kept a running account with the sub-contractor other than that shown by the answer to the interrogatories—one of the many pleadings—which consisted only of a list of the numbers and dates of checks totaling $8360. Certainly, a statement or other accounting showing only payments made by a debtor is not a running account. Ordinarily, a running account is one which is kept to show all transactions between a debtor and creditor, *i.e.,* a continuous record of the entry of charges as well as payments on account. See *Carozza v. Brannan, supra.* It may be that the sub-contractor kept a running account on *their* books of their dealings with the supplier, but there is no evidence that the supplier kept a running account on *its* books of transactions with the sub-contractor. The only evidence on this point shows the exact opposite. The summary invoice attached to and made a part of the amended declaration without objection, shows that I.B.M.'s account with the sub-contracting firm [C. A. Russell] was based on the partnership's Order No. 2990 for Job No. 953 (Kenwood High School). We think it is clear that this summary invoice is not a running account. Moreover, it clearly indicates by dates and check numbers and amounts that the payments of $2419, plus a credit of $10.50, made on and after May 31, 1955, were applied to I.B.M.'s Order No. E 18084 for the materials cost-

ing $4367, which left a balance due of $1937.50, the amount claimed by I.B.M.

The further claim that the opposing affidavit of the secretary-treasurer shows a genuine dispute is clearly without merit. For the most part his testimony, allegedly on personal knowledge, was so fully discredited by his own admissions in open court that the affidavit had no evidentiary value to create an issue of fact.

There was also a claim that the facts alleged in the pleas—particularly the special pleas—on which issue had been joined in writing, established a genuine dispute as to material facts. By the first of such of those pleas as are still at issue on this appeal, it was alleged that the sub-contractor had fully paid I.B.M., that such payment had been made from moneys paid by Mullan to the sub-contractor, and that the general contractor had provided and paid for all necessary materials to complete the electrical work. Obviously these pleas do no more than state general allegations that the necessary materials had been provided and paid for. They fail to state specifically how the materials were provided and when and how payment therefor was made. Actually, the basis for two of these allegations is the same as the claim already discussed to the effect that during the period the Kenwood project was in progress the sub-contractor had paid I.B.M., $8360 out of moneys paid to them by Mullan which should have paid in full the $4367 the equipment cost. The short answer to this claim is that these pleas, in order to raise a triable issue of a material fact, would have to have shown in detail and with precision, by *facts* admissible in evidence, and not by *allegations,* that there was a genuine dispute. *Frush v. Brooks,* 204 Md. 315, 321, 104 A. 2d 624 (1954). See also *Strickler Engineering Corp. v. Seminar,* 210 Md. 93, 122 A. 2d 563 (1956). Cf. *Fletcher v. Flournoy,* 198 Md. 53, 81 A. 2d 232 (1951), *cert. den.* 343 U. S. 917 (1952); *White v. Friel,* 210 Md. 274, 123 A. 2d 303 (1956). And see *Chambers & Company v. Equitable Life Assurance Soc.,* 224 F. 2d 338 (5th Cir., 1955) ["disclosure (of facts) under summary judgment must be full and complete"]; *Bruce Construction Corp. v. United States,* 242 F. 2d 873 (5th Cir., 1957) ["the adversary (must) adequately demonstrate by re-

ceivable facts that a real, not formal, controversy exists, and, of course, he does not do that by mere denial or holding back evidence"] ; 6 Moore, *Federal Practice*, § 56.15[3] (2d Ed. 1953) ["the careful practitioner in resisting a motion will, whenever possible, make certain that ample opposing evidence is on file"]. While the general contractor and sureties, if given more time, might have brought forward other evidence which would have strengthened their case, the eleventh-hour attempt to have discovery and take depositions in the usual manner under the provisions of Chapter 400 of the Maryland Rules— instead of taking advantage of the provisions of Rule 610 d 2— came too late. And, when the court declined to postpone the hearing on the motion for summary judgment, it did not abuse its discretion. See *Clarke Baridon v. Union Co.,* 218 Md. 480, 147 A. 2d 221 (1958), in which we held it was not an abuse of discretion to refuse to continue a summary judgment hearing because the attorney was scheduled to appear on the same day before an administrative agency. See also *Cumberland & Westernport Transit Co. v. Metz,* 158 Md. 424, 149 A. 4, 565 (1930) ; *Harris v. State,* 141 Md. 526, 119 A. 154 (1922) ; *Thornton v. Malin,* 68 Nev. 263, 229 P. 2d 915 (1951) [refusal to continue for purpose of taking deposition was not reversible error]. The further allegation that Mullan had paid the sub-contractor is a defense which was not available to it since payment to a sub-contractor does not release a general contractor from liability under a payment bond. *United States Fidelity & G. Co. v. Housing Authority,* 206 Md. 379, 111 A. 2d 658 (1955).

Another plea, predicated on the theory that I.B.M. had to supply both labor *and* materials in order to recover, raised a question of law. We think it is so obvious that the bonds cover either those supplying labor or those supplying materials or both that this contention ought to be ignored. In any event, no authorities were cited to support the proposition and we know of none directly in point. See, however, Code (1957), Art. 63, § 1, which states that a mechanics' lien may be obtained for work done *and* materials furnished. See also *Standard Ins. Co. v. U. S.,* 302 U. S. 442 (1938), where, in a suit on a bond given to protect all persons supplying "labor and

materials" for a public building, the Supreme Court held that a railroad transporting *materials* could recover the freight charges thereon, and stated at p. 444: "[W]e are committed to the doctrine that * * * [the bond] should be liberally construed in aid of the evident public object—security to those who contribute labor or material for public works."

Lastly, there were the "estoppel" pleas to the effect that I.B.M. is now estopped to assert its claim against Mullan and the sureties because it failed to do so before the institution of bankruptcy proceedings against the sub-contractor and that Mullan had changed its position. These, too, except as noted below, raised only a question of law. No authorities were cited on the estoppel question, and we know of none. Certainly *Tompson v. Winterbottom,* 154 Md. 581, 141 A. 343 (1928), cited by the general contractor and sureties, is not in point. The closest cases we have found in this area are mechanics' lien cases where it has been held that mere silence by the creditor when he knows that the contractor is not paying him and that the contractor is being paid by the owner does not amount to an estoppel precluding the creditor from claiming a mechanics' lien. See *Caltrider v. Weant,* 147 Md. 338, 128 A. 72 (1925); *Mivelaz v. Genovely,* 121 Ky. 235, 89 S. W. 109 (1905). The allegation as to a change of position, failed to allege facts showing in what manner Mullan had changed position to its prejudice, and for that reason, as previously stated, was ineffectual.

Finally, Mullan and the sureties complain that I.B.M.'s demurrers to certain pleas, subsequently abandoned, were never argued or specifically passed upon by the lower court. We are at a loss to understand the purpose of this complaint. In any event an examination of the demurrers shows that no question or point of law was therein presented which will not have been considered in this opinion.

We think it is clear that all of the matters relied on by the general contractor and sureties to show a genuine dispute as to material facts created only a formal or potential dispute which was lacking in substance.

(ii)

The data offered in support of summary judgment was not

defective and was sufficient to satisfy the rule. Mullan and the sureties contend that the failure of I.B.M. to set out the contract documents in full was fatal. We disagree. The extracts of the portions of the contract documents, which Mullan and the sureties claim were not enough, got into the pleadings by way of a request for admission of facts and genuineness of documents pursuant to Rule 421, in reply to which it was admitted that the excerpts—as well as full copies of the construction contract and the performance and payment bonds—were true and correct. It is true, of course, that it was also pointed out in the reply that the excerpts were quoted out of context and that there were other provisions which should be considered, but in so doing the "other provisions" were not identified nor was any reason assigned why such other provisions were required. If the excerpts were not complete and were quoted out of context, Mullan and the sureties should have pointed out how they were modified or limited by other provisions of the contract or they should have refused to admit that the excerpts were correct. A court cannot decide an issue in a vacuum, and as we have previously stated herein, mere allegations are not sufficient. Rule 421 b provided Mullan and the sureties with the power to refuse to admit the genuineness of the documents when information or knowledge was not within their power or to set forth in detail the reasons why they could not truthfully either admit or deny the matters. Furthermore, it would seem there was implicit in the admission of genuineness a further admission of sufficiency for the purpose intended. The primary function of a request for admissions is to avoid the necessity of preparation, and proof at the trial, of matters which either cannot be or are not disputed.[5] With this ruling it is unnecessary for us to pass upon the failure to exhibit full copies of the contract documents in this case.

The general contractor and sureties concede that the deposition was "possibly" admissible against the sub-contractor as an admission of the balance due to I.B.M., but they contend that the deposition was not sufficient to sustain the motion since

---

5. See the footnote to Rule 421 e. See also *Thurman v. Hughes & Co.*, (Sup. Ct. of Balt. City, Niles, C.J.), D.R. April 6, 1955.

it was not binding on them in any event. Even if we assume, without deciding, that the deposition was not binding as against Mullan and the sureties, the legal consequences would not be different since the uncontradicted testimony of the deponent showed conclusively that the balance of $1937.50, which the sub-contractor owed I.B.M. for materials installed in the Kenwood project, had not been paid.

(iii)

I.B.M. was entitled to a judgment as a matter of law. Once it has been established, as the trial court properly stated, that the sub-contractor was indebted to the supplier in a case such as this, the liability of the general contractor and its sureties is clear. The liability is based on the provisions of the payment and performance bonds. One—the payment bond—provided that the general contractor, as principal, and his sureties should "promptly make payment to all persons supplying labor and material in the prosecution of the work." The other— the performance bond—obligated the principal and sureties to "well and truly perform and fulfill all of the undertakings, covenants, terms, conditions and agreements of * * * [the] contract, which, among other things, provided that the "[c]ontractor [should] provide and pay for all materials * * * necessary for the execution and completion of the work" in connection with the installation of the wiring and signal systems. On these bonds and contract provisions the judgment below was properly entered. *Board of Education v. Lange,* 182 Md. 132, 32 A. 2d 693 (1943); *Lange v. Board of Education,* 183 Md. 255, 37 A. 2d 317 (1944); *United States Fidelity & G. Co. v. Housing Authority, supra.* See also *Kirby & McGuire, Inc. v. Board of Education,* 210 Md. 383, 123 A. 2d 606 (1956).

(iv)

The allowance of interest was proper. Ordinarily, the allowance of interest is a matter which rests in the discretion of the trier of the fact. *Shoop v. Fidelity & D. Co.,* 124 Md. 130, 91 A. 753 (1914). See also *Baltimore City Pass. Rwy. Co. v. Sewell,* 37 Md. 443 (1873) [interest is a question for jury to decide according to the equities of the transaction].

But there are cases in which interest is recoverable as of right and this is such a case. See *Baltimore City Pass. Rwy. Co. v. Sewell, supra.* In this case liability for the payment of interest attached on November 20, 1956, when I.B.M. made demand on Mullan and the sureties for payment of the balance due on its claim against the sub-contractor. However, the interest should have been calculated only from that date, a period of two years and six days, which, at 6% on the sum of $1937.50, amounts to $234.44. See *Affiliated Distillers v. R. W. L. Co.,* 213 Md. 509, 132 A. 2d 582 (1957), a summary judgment proceeding, wherein the trial court, having denied interest believing it "within its discretion," interest was allowed on appeal as a matter of law on a unilateral contractural obligation which required payment of a liquidated sum at a certain time. See also McCormick, *Damages,* § 58 (1935).

Since the lower court allowed interest in the sum of $483 instead of $234.44, the judgment of $2420.50 will be reduced to $2171.94, and as modified will be affirmed.

> *Judgment reduced from $2420.50 to $2171.94, and as modified affirmed; the appellants to pay the costs.*